*In re* CAW

Docket No. 235731. Submitted September 5, 2002, at Detroit. Decided November 1, 2002, at 9:10 A.M. Leave to appeal granted, 467 Mich 921.

The Family Independence Agency filed a petition in the Macomb Circuit Court, Family Division, initiating child protective proceedings concerning three minors, one of whom was C.A.W., born to Deborah A. Weber. The petition alleged abuse and neglect by Weber and her husband, Robert Rivard, and also alleged that Larry Heier may be the biological father of C.A.W. Notice to Heier of the initial hearing was by publication in the Macomb County Legal News, which indicated an incorrect date for the hearing. At the hearing, the court, Pamela Gilbert O'Sullivan, J., continued the children's placement in foster care. At a subsequent hearing, on the basis of testimony by Weber that Heier was not the father of C.A.W. and testimony by Rivard that he was the child's father, the court amended the petition to delete any references to Heier. Weber and Rivard pleaded no contest to the amended petition. The Family Independence Agency petitioned for the termination of Weber and Rivard's parental rights. Following a hearing, the court terminated the parental rights of Weber and Rivard. Heier moved to intervene to claim that he was C.A.W.'s father. The court denied the motion, ruling that Heier lacked standing because Rivard was the child's legal father. Heier appealed by leave granted.

The Court of Appeals *held*:

1. MCR 5.921 allows a court presiding over a child protective proceeding to determine the identity of a putative father during the pendency of the proceeding if the court at any time during the pendency of the proceeding determines that the child has no father as defined in MCR 5.903(A)(4). Under MCR 5.921 and MCR 5.903, the court can determine the child to be born out of wedlock and then take appropriate steps to determine the identity and rights of the biological father. In this case, the appellant has standing to intervene and should be given the opportunity to establish his paternity.

2. The appellant's due process argument regarding the stringent standing requirements under the Paternity Act, MCL 722.711 *et seq.*,

and his argument regarding notice need not be addressed in light of the resolution of the standing issue.

Reversed and remanded for further proceedings.

FITZGERALD, P.J., dissenting, stated that the appellant lacks standing to establish paternity pursuant to the Paternity Act in the absence of an adjudication by a court of competent jurisdiction that the child was a child born or conceived during a marriage but not the issue of that marriage, that the appellant did not have a substantial relationship with the child that would allow him to challenge the stringent standing requirements of the Paternity Act as being violative of due process, and that the notice issue need not be addressed in view of the lack of standing. The lower court's denial of the appellant's motion to intervene should be affirmed.

PARENT AND CHILD — CHILD PROTECTIVE PROCEEDINGS — PATERNITY.

A court presiding over a child protective proceeding involving married parents has the authority to determine whether the child was born out of wedlock and to determine the identity of the biological father and his rights with respect to the child (MCR 5.903, 5.921).

*Jennifer M. Granholm,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Chantal B. Fennessey,* Assistant Attorney General, for the Family Independence Agency.

*Dinning & Greve, P.L.C.* (by *Ronald H. Greve*), for Larry Heier.

Before: FITZGERALD, P.J., and BANDSTRA and GAGE, JJ.

GAGE, J. Appellant Larry Heier appeals by leave granted the trial court's order denying his motion to intervene in this matter. In November 2000, the trial court terminated the parental rights of Deborah Weber and Robert Rivard to Weber's three children, including the child at issue, C.A.W. Weber was married to Rivard at the time of the child's conception and birth; however, at various times during the proceedings, it was admitted that Rivard may not be the father of the child and that appellant may be the child's father. After the trial court terminated the

parental rights of Weber and Rivard, appellant filed a motion to intervene, claiming to be the child's biological father. The trial court denied appellant's motion to intervene, finding that appellant lacked standing. We reverse and remand.

## I. FACTUAL BACKGROUND

In July 1998, a petition was filed on behalf of three minor children: J.W., then aged six; B.W., then aged four; and C.A.W., the child at issue, then aged fifteen months. The petition alleged that the parents, Weber and Rivard, were guilty of abuse and neglect. The petition alleged that Rivard is the father of all three children, but also stated that Rivard may not be the biological father of any or all of the children because Weber admitted to having relationships with other men during the marriage. Finally, the petition stated that "[C.A.W.'s] alleged biological father is Larry Hier [sic]."

At the time of the petition, appellant's address was allegedly unknown, so the court granted an order of substituted service by which notice was given by publication in the Macomb County Legal News. Although the hearing was scheduled for August 19, 1998, the Legal News made a clerical error and published notice that the hearing would be held on August 9.

At the August 19, 1998, hearing, the court held that the children should remain in foster care pending adjudication on the petition for custody. Apparently, at a subsequent hearing on September 3, 1998, the child's paternity was at issue and Weber testified that appellant was not C.A.W.'s father, and Rivard testified that he was the father. On the basis of this testimony,

the court amended the petition to delete any reference to appellant, although the petition continued to note that there was some question whether Rivard is the biological father of any or all of the children.[1]

At the hearing, Weber and Rivard pleaded no contest to the amended petition. After a review hearing in April 1999, the court ordered the "natural father" to submit to paternity testing. In a subsequent order entered on July 13, 1999, the court ordered Rivard to "comply with the Parent/Agency Agreement, [and] participate in paternity testing." In January 2000, petitioner filed a petition to terminate the parental rights of both Weber and Rivard to all three children.

At the termination trial, appellant's identity as C.A.W.'s father was again discussed. At one point during testimony, Weber stated that Rivard was the child's natural father, but also admitted to previously stating that Rivard may or may not be the father of all the children. When asked who the children believed was their father, Weber replied, "Mr. Rivard, except for [C.A.W.]." During this testimony, Weber also talked about a man by the name of "Larry," whom she had been seeing and who often played with the children. A protective services worker testified at various times during the case that the agency had attempted to ascertain the identity of the natural father of each child, but Weber was not forthcoming with the information. Weber provided names of different individuals who she thought might be a father, but could not indicate where the individuals were living. The agency did not take any steps to inquire into who

---

[1] These facts were asserted by both parties; however, this Court was not provided with transcripts of every hearing.

might be the natural father of each child other than the notice previously published by the court.

By way of an order entered on November 13, 2000, the trial court terminated the parental rights of Weber and Rivard. Weber appealed to this Court and this Court affirmed the trial court's decision.[2] Rivard did not appeal the trial court's decision terminating his parental rights to the three children.

In the meantime, appellant filed a motion to intervene, alleging that he is C.A.W.'s biological father and that the trial court failed to provide him with proper notice of the proceedings. By way of an order entered on April 26, 2001, the trial court denied appellant's motion to intervene on the ground that appellant lacked standing because the child already had a legal father. This appeal followed.[3]

Appellant raises several issues in this appeal. The primary issue that appellant raises, which is dispositive in this case, is whether appellant had standing to intervene in the lower court proceedings. We note that appellant also raised a due process argument as well as an argument regarding whether he received proper notice of the proceedings below. Because we find the standing issue dispositive in this case, we decline to address defendant's constitutional arguments in any great detail.

---

[2] *In re Weber*, unpublished memorandum opinion of the Court of Appeals, issued October 26, 2001 (Docket No. 232206).

[3] Appellant filed a claim of appeal with this Court in Docket No. 234321 from the trial court's order denying his motion to intervene. That appeal was dismissed on June 13, 2001, for lack of jurisdiction. Appellant then filed a delayed application for leave to appeal, which was granted on September 12, 2001.

## II. STANDING

The resolution of the issue of standing in this case will have a great effect on family courts throughout the state. Here, the issue is not whether a legal father and putative father can coexist, but whether a putative father's paternity can be established during child protective proceedings. While Michigan's Paternity Act, MCL 722.711 *et seq.*, permits a father to establish paternity if there has been a prior determination that the child was born out of wedlock, the Juvenile Code, and case law interpreting it, is less instructive.

Standing to pursue relief under the Paternity Act is conferred on (1) the mother of a child born out of wedlock, (2) the father of a child born out of wedlock, or (3) the Family Independence Agency on behalf of a child born out of wedlock who is being supported in whole or in part by public assistance. MCL 722.714(1), (8). The child is considered to be born out of wedlock if the mother was not married from the time of the child's conception to its birth or if the child is one that "the court has determined to be a child born or conceived during a marriage but not the issue of that marriage." MCL 722.711(a). The language of this statute has been determined by the Supreme Court to mean that there must be a prior circuit court "determination that the child was not the issue of the *marriage at the time of filing the complaint.*" *Girard v Wagenmaker*, 437 Mich 231, 242-243; 470 NW2d 372 (1991). (emphasis in original).

In this case, appellant did not seek to establish paternity under the Paternity Act, but sought to intervene in child protective proceedings. Under MCR 5.903, "child born out of wedlock" is defined as a

child "conceived and born to a woman who is unmarried from the conception to the birth of the child, or a child determined by judicial notice or otherwise to have been conceived or born during a marriage but who is not the issue of that marriage." Under MCR 5.921(D), if at any time during the pendency of a proceeding, the court determines that the child has no father as defined in MCR 5.903(A)(4), the court may take appropriate action to determine the identity of the natural father.[4]

In *In re Kozak*, 92 Mich App 579; 285 NW2d 378 (1979), the plaintiff petitioned the probate court for a custody hearing and a stay of adoption proceedings after the child's mother and her husband filed a petition in the probate court to terminate their parental rights, to identify the natural father of the child, and

---

[4] MCR 5.903(A)(4) defines "father" as:

   (a) a man married to the mother at any time from a minor's conception to the minor's birth unless the minor is determined to be a child born out of wedlock;

   (b) a man who legally adopts the minor;

   (c) a man who was named on a Michigan birth certificate for a minor born after July 20, 1993, as provided by MCL 333.21532; MSA 14.15(21532); or

   (d) a man whose paternity is established in one of the following ways within time limits, when applicable, set by the court pursuant to this subchapter:

   (i) the man and the mother of the minor acknowledge that he is the minor's father by completing and filing an acknowledgement of paternity. . . .

   (ii) the man and the mother file a joint written request for a correction of the certificate of birth pertaining to the minor that results in issuance of a substituted certificate recording the birth;

   (iii) the man acknowledges that he is the minor's father by completing and filing an acknowledgement of paternity, without the mother joining in the acknowledgment . . . .

   (iv) a man who by order of filiation or by judgment of paternity is determined judicially to be the father of the minor.

to determine or terminate his rights. The court accepted the release of the child and terminated the rights of the unknown natural father. *Id.* at 581. The court placed the child with the defendant Catholic Social Services to await adoption or suitable placement and the child was then made a ward of the probate court and placed with prospective adoptive parents. The plaintiff thereafter filed an affidavit of interest and acknowledgement of paternity and requested a stay of the adoption proceedings, alleging that he was the child's natural father and wanted custody; however, the trial court denied the plaintiff's petitions. This Court reversed, holding that because fraud on the part of the parents was alleged, the case should be remanded for a hearing on the matter. *Id.*

In *In re Montgomery*, 185 Mich App 341; 460 NW2d 610 (1990), the respondent sought to participate in proceedings to terminate the parental rights to a minor child. The trial court found that the respondent lacked standing to participate in the proceedings because he was not the minor child's biological father. *Id.* at 343. After reviewing the court rules that define "father" and "parent," this Court held that the probate court properly granted the motion to strike respondent, the mother's husband, as a party for lack of standing. *Id.* At the adjudication hearing, the respondent admitted he was not the biological father of the child and testified that he had not had sexual relations with the child's mother for fifteen months before the child's birth because he was incarcerated during that time. The child's mother also testified that the respondent was not the child's father. Thus, the "legal father" was dismissed and the probate court expressly found that another individual was the

child's biological father. In other words, the court made a determination of paternity during a neglect proceeding, precisely what the court could have done in the instant case.

In this case, the identity of the child's biological father was an issue at the onset of the case. Appellant was named the child's alleged biological father in the initial petition. The trial court ordered notice of the initial proceedings be given to appellant; however appellant did not appear at the proceedings because he allegedly did not receive the notice. For reasons that are not completely clear from the record, the court deleted appellant's name as the child's alleged biological father from the amended petition and appellant's name was not listed on any subsequent petitions. The court ordered DNA testing, but there is no indication in the record of such testing or the results thereof.

The definition of "child born out of wedlock" in MCR 5.903(A)(1) is less restrictive than that under the Paternity Act or the Probate Code. Our courts have established that under the Paternity Act, there must have been a prior determination that a child was not the issue of a marriage for a putative father to have standing to establish paternity. *Girard, supra.* However, MCR 5.903(A)(1) uses the language, "a child determined by judicial notice or otherwise." Although subtle, there is a difference. MCR 5.921 allows the court to determine the identity of a putative father during the pendency of a protective proceeding if the court *at any time during the pendency* of the proceeding determines that the child has no father as defined by the court rules. Reading MCR 5.921 in conjunction with MCR 5.903 under the authority of *Mont-*

*gomery,* we find that during child protective proceedings, the court can determine the child to be born out of wedlock and then take appropriate steps to determine the identity and rights of the biological father.[5]

In this case, appellant was the alleged biological father of the child, but did not take part in the initial proceedings. Although the court ordered that he be given notice of the initial proceedings, appellant claims he did not receive notice. We are troubled by questions regarding whether the parties knew of appellant's whereabouts and did not inform the court at the initiation of the proceedings and regarding whether appellant had established a relationship with the child before the commencement of these proceedings. Further, the record is not completely clear concerning why the issue of appellant's possible identity as the biological father was abandoned. Weber did appear to change her mind and testified that Rivard was the biological father and a marriage certificate was produced acknowledging the validity of Weber's marriage to Rivard. However, there still remained questions regarding whether Rivard was the biological father and it is unknown whether Rivard submitted to paternity testing as ordered by the court. On the facts of this case, remand would be appropriate for the court to determine the child's paternity in the protective proceedings.

---

[5] This case is similar to establishing paternity under the Adoption Code. Under MCL 710.22, "born out of wedlock" means "a child conceived and born to a woman who was not married from the conception to the date of birth of the child, or a child whom the court has determined to be a child born during a marriage but not the issue of that marriage." However, MCL 710.36 provides for a hearing to determine whether a child was born out of wedlock and to determine the rights of a putative father.

We recognize that in this case, however, although the court could have determined the child to be born out of wedlock, the court did not do so, and instead terminated the rights of Rivard, the legal father. However, we find that because the court could have determined the child to be born out of wedlock during the proceedings and then determined the identity of the biological father, it naturally follows that once the court terminated Rivard's parental rights, he was no longer the legal father, and the court could then take the appropriate steps to identify the biological father.

We liken the issue in this case to one under the Adoption Code, MCL 710.21 *et seq.* For a child to be adopted, the biological parents must consent to the adoption or there must be proof of release or orders terminating the parental rights over the child. MCL 710.26. If the child is claimed to be born out of wedlock and the mother executes a release or consent relinquishing her rights or joins in a petition for adoption, and the release of the natural father cannot be obtained, the court must hold a hearing to determine whether the child was born out of wedlock, to determine the identity of the father, and to determine or terminate the father's rights. MCL 710.36. Therefore, the court can determine the child to be born out of wedlock and determine the rights of the putative father. For a child to be adopted, all parents must relinquish their legal rights to the child either by consenting to the adoption or by the court terminating their rights.

Although the court in this case did not explicitly determine that Rivard was not the child's father under the court rules, the court terminated Rivard's parental rights. The termination of parental rights severs the

rights of the natural parents to their child. See MCL 712A.20. The court's termination of Rivard's parental rights severed any legal rights he had to the child. In effect, Rivard was no longer the child's "legal father."

We acknowledge that the court rules do not specifically state that an individual is no longer a "father" once his legal rights are terminated. Further, it is acknowledged that, in this case, Rivard may still meet one or several of the definitions listed for father in MCR 5.903(A)(4). However, although he may technically meet the definitions, he no longer has any legal rights as a "father."

The trial court essentially denied appellant the opportunity to intervene on the basis that appellant lacked standing because the child already had a legal father. However, Rivard's parental rights, which evolved from his status as "legal father," were terminated. Once Rivard's parental rights were terminated, Rivard no longer possessed any rights as a "legal father." Therefore, at that time, the child was without a legal father and questions remained with regard to appellant. Because the court has the ability to determine the rights of a putative father during the protective proceedings, the court then had the ability to determine the rights of appellant as the putative father.

In child protective proceedings, the welfare and protection of the child is explicitly at issue. When questions arise during these proceedings regarding the identity of the child's father, it is imperative to determine the identity and rights of the child's biological father. If appellant is the child's biological father, his fitness can be tested. It is preferable to have a

child living with a fit biological parent in a stable environment rather than being a ward of the state.

Although we find it somewhat disturbing that appellant waited until after the parental rights of Weber and Rivard were terminated to intervene in the matter, this fact should not deny appellant the opportunity to establish his rights in this case. Appellant contends that he did not receive notice that his rights could be affected by the adjudication. Appellant further alleges that although he knew of the proceedings against Weber, he did not come forward because he did not want to disrupt the family, and Weber assured him that she was complying with the court-ordered placement plan and would regain custody of the children. Additionally, the trial court was aware of appellant's possible identity throughout this case.

Although we find appellant has standing to intervene in this case, this should not be interpreted to mean that appellant is entitled to any rights over the child. We find only that appellant should be given the opportunity to establish his paternity. If appellant establishes that he is the child's biological father, his fitness must then be tested.

III

It is well established that the custody, care, and nurture of a child reside first with the parents. See *Troxel v Granville*, 530 US 57; 120 S Ct 2054; 147 L Ed 2d 49 (2000). Appellant argues that the stringent standing requirements of the Paternity Act deprived him of a recognized liberty interest without due process of law. In *Hauser v Reilly*, 212 Mich App 184; 536 NW2d 865 (1995), the plaintiff brought a paternity

action, alleging that he was the father of a child born to the defendant while the defendant was married to another man. The trial court dismissed the action, finding that the plaintiff lacked standing under the Paternity Act. This Court adopted Justice Brennan's dissenting view in *Michael H v Gerald D*, 491 US 110, 142-143; 109 S Ct 2333; 105 L Ed 2d 91 (1989), finding that a putative father's liberty interest derives "from the father's biological link with his child, combined with a substantial parent-child relationship." *Hauser, supra* at 187-188. This Court found that because the plaintiff did not have an established relationship with his child, he was not denied his right to due process. *Id.* at 188-189. In *McHone v Sosnowski*, 239 Mich App 674, 679; 609 NW2d 844 (2000), this Court declined to adopt the decision in *Hauser* concerning a putative father's liberty interest in the parenting of his child.

Justice Brennan defined a substantial parent-child relationship as, "[w]hen an unwed father demonstrates a full commitment to the responsibilities of parenthood by 'com[ing] forward to participate in the rearing of his child.' " *Michael H, supra* at 143, quoting *Lehr v Robertson*, 463 US 248, 261; 103 S Ct 2985; 77 L Ed 2d 614 (1983), and *Caban v Mohammed*, 441 US 380, 392; 99 S Ct 1760; 60 L Ed 2d 297 (1979). Although appellant argues that he established a relationship with the child, because we find that appellant should have the opportunity to establish his paternity in the child protective proceedings, we need not address his due process argument regarding the stringent standing requirements under the Paternity Act.

Likewise, because we find appellant should have the opportunity to establish paternity, we need not address the issue regarding notice. However, we will briefly discuss the merits of the argument. Generally, a putative father is not entitled to notice of child protective proceedings until he establishes that he is the father. See *In re AMB*, 248 Mich App 144, 174; 640 NW2d 262 (2001); *In re NEGP*, 245 Mich App 126, 134; 626 NW2d 921 (2001). However, in this case, appellant was named as the child's alleged biological father early in the proceedings. Because appellant was named as the possible biological father, the court ordered that appellant be served with notice of the proceedings.

In his motion to intervene, appellant alleged that he provided support to Weber and visited the child on a daily basis and that he continued to visit the child after the child was placed in foster care. He also alleged that his whereabouts were known by Weber as well as the foster parent, but no efforts were made to personally notify him of the court proceedings.[6] The notice published in the Macomb County Legal News listed an erroneous date for the hearing.

Essentially, appellant argues fraud on the part of Weber in failing to inform the court of appellant's whereabouts. As noted previously, under the court rules, the court could determine during the protective proceedings that the child was a child born out of wedlock and then take action to determine the identity of the biological father. Under MCR 5.921(B)(1), appellant was "any other person the court may direct

---

[6] The child's foster parent submitted an affidavit stating that she did not know appellant, that he never attempted to visit the child, and that she at no time knew of appellant's whereabouts.

to be notified." Thus, because the court directed that
he be notified, appellant was entitled to reasonable
notice.

### IV. CONCLUSION

Because this case involved a child protective pro-
ceeding and appellant's identity as the alleged biologi-
cal father was at issue from the onset, we find appel-
lant had standing to intervene in this matter. The trial
court had the authority to determine the child to have
been born out of wedlock during the proceedings and
then determine appellant's rights. Further, at the
moment the court terminated Rivard's parental rights
to the child, Rivard was no longer the "legal father."
Thus, appellant's status as putative father should
rightfully again have been made an issue. Appellant,
at the very least, should have been given the opportu-
nity to establish his paternity. If in fact his paternity
was established, the court could then have inquired
into his fitness to gain custody of the child.

Reversed and remanded for further proceedings
consistent with this opinion.

BANDSTRA, J., concurred.

FITZGERALD, P.J. (*dissenting*). Although I am sympa-
thetic to the majority's concern that appellant did not
have the opportunity to establish standing, I respect-
fully dissent from the majority's conclusion that
appellant has standing to intervene in this matter
under the law as it currently exists.

Appellant Larry Heier claims to be the biological
father of the minor child in this matter. In November
2000, the trial court terminated the parental rights of

Deborah Weber and Robert Rivard to the child. Weber was married to Rivard at the time of the child's conception and birth. After the trial court terminated Weber's and Rivard's parental rights to the minor child and two other children, Weber appealed to this Court. This Court affirmed the trial court's decision.[1] Rivard did not appeal the trial court's decision terminating his parental rights to the three children.

In the meantime, in January 2001, appellant filed a motion to intervene, claiming that he was the child's biological father and that the trial court failed to provide him with proper notice of the proceedings. On April 26, 2001, the trial court issued an order denying appellant's motion to intervene on the basis that he lacked standing to intervene because the child already had a legal father. This appeal followed.[2]

On appeal, appellant argues that the trial court erred by denying his motion to intervene on the basis that he lacked standing. Whether a party has standing to bring an action involves a question of law that is reviewed de novo. *Lee v Macomb Co Bd of Comm'rs*, 464 Mich 726, 734; 629 NW2d 900 (2001). Constitutional questions are also reviewed de novo. *People v Pitts*, 222 Mich App 260, 263; 564 NW2d 93 (1997).

---

[1] *In re Weber*, unpublished memorandum opinion of the Court of Appeals, issued October 26, 2001 (Docket No. 232206).

[2] Appellant filed a claim of appeal with this Court in Docket No. 234321 from the trial court's order denying his motion to intervene. That appeal was dismissed on June 13, 2001, for lack of jurisdiction because the trial court's order denying the motion to intervene was not a final order appealable by right. Appellant then filed a delayed application for leave to appeal, which was granted on September 12, 2001.

I. STANDING

Appellant attempted to intervene after the trial court had already terminated the parental rights of Weber and her husband, Rivard. Although there was some testimony in the record supporting appellant's claim that he might be the child's biological father, the trial court held that appellant lacked standing because the child already had a legal father as a result of the marriage between Weber and Rivard.

Standing to pursue relief under the Paternity Act is conferred on (1) the mother of a child born out of wedlock, (2) the father of a child born out of wedlock, or (3) the Family Independence Agency on behalf of a child born out of wedlock who is being supported in whole or in part by public assistance. MCL 722.714(1), (8). A child is considered to be born out of wedlock if the mother was unmarried from the child's conception to its birth, or if the child is one that "the court has determined to be a child born or conceived during a marriage but not the issue of that marriage." MCL 722.711(a). The Supreme Court has interpreted this language to mean that there must be a prior circuit court "determination that the child was not the issue of the *marriage at the time of filing the complaint.*" *Girard v Wagenmaker*, 437 Mich 231, 242-243; 470 NW2d 372 (1991) (emphasis in original). The clear language of the statute requires a finding in this case that the child was not born out of wedlock. *People v Stone*, 463 Mich 558, 562; 621 NW2d 702 (2001) (if the statute's language is clear and unambiguous, then we assume that the Legislature intended its plain meaning and the statute is enforced as written).

The record is unclear whether appellant is the biological father of the minor child. However, it is undisputed that the child's mother was married to Rivard at the time of the minor child's conception and birth. Absent an adjudication by a court of competent jurisdiction that the minor child was a "child born or conceived during a marriage but not the issue of that marriage," for purposes of the Paternity Act, appellant, as the purported biological father, lacked the requisite standing to establish his paternity. See *McHone v Sosnowski*, 239 Mich App 674; 609 NW2d 844 (2000) (holding that the biological father did not have standing to pursue an order of filiation when there was no prior judicial determination that the child was not the issue of the marriage).

Appellant contends, however, that there is a distinction between actions under the Paternity Act and child protective proceedings with regard to when paternity can be established. In this regard, appellant argues that the court rules applicable to child protective proceedings provide that paternity can be established while an action is pending. However, even assuming that appellant's principle of law is sound, the record reveals that appellant failed to come forward, either before this action was commenced or before the court terminated the parental rights of the mother and legal father, to attempt to establish his paternity. Hence, appellant's argument is without merit. Thus, I would conclude that the trial court did not err in ruling that appellant lacked standing to challenge the court's decision to place the minor child for adoption. Again, I am sympathetic to the position of the majority, but being confined by the law as it

currently exists, I would recommend that the Legislature revisit this issue.

## II. DUE PROCESS

Appellant argues that the Paternity Act's stringent standing requirements deprived him of a recognized liberty interest without due process of law. In support of this argument, appellant relies on *Hauser v Reilly*, 212 Mich App 184; 536 NW2d 865 (1995). In *Hauser*, the plaintiff argued that the Paternity Act, by precluding him from obtaining standing, deprived him of his right to due process. *Hauser, supra* at 187. This Court adopted Justice Brennan's dissenting view in *Michael H v Gerald D*, 491 US 110, 142-143; 109 S Ct 2333; 105 L Ed 2d 91 (1989), inasmuch as this Court held that a putative father's liberty interest derives "from the father's biological link with his child, combined with a substantial parent-child relationship." *Hauser, supra* at 187-188. This Court further found that because the plaintiff did not have an established relationship with his child, he was not denied his right to due process. *Id.* at 188-189. This Court noted that the plaintiff had "never had legal custody of the child and has never shouldered any responsibility with respect to the daily supervision, education, protection, or care of the child." *Id.* at 190. Because the Court in *Hauser* found no parenting relationship of any kind to exist between the plaintiff and the child, an analysis of a liberty interest based on a substantial parent-child relationship was not essential to the outcome of the case. " 'Statements concerning a principle of law not essential to [a] determination of the case are obiter dictum and lack the force of an adjudication.' " *Gallagher v Keefe*, 232 Mich App 363, 374; 591

NW2d 297 (1998) (citation omitted). Nonetheless, even if *Hauser* were followed and the test discussed by Justice Brennan applied, appellant cannot show that he was denied his right to due process.

The record does not establish that appellant had a substantial relationship with the minor child as a parent. In his dissent, Justice Brennan defined a substantial parent-child relationship as, "[w]hen an unwed father demonstrates a full commitment to the responsibilities of parenthood by 'com[ing] forward to participate in the rearing of his child.'" *Michael H, supra* at 143, quoting *Lehr v Robertson,* 463 US 248, 261; 103 S Ct 2985; 77 L Ed 2d 614 (1983), and *Caban v Mohammed,* 441 US 380, 392; 99 S Ct 1760; 60 L Ed 2d 297 (1979). There is no record support that appellant had a relationship with the minor child that could be defined as substantial or to the point that appellant was actively fulfilling his role as a parent. There are indications that he visited and played with all three children on a regular basis when they lived with Weber and that he provided some support. However, it is troubling that, although appellant claimed to be aware that the child was in foster care and had been removed from Weber's custody, he did nothing more than possibly visit with the child at the foster parent's home a few times. He did not even immediately come forward when Weber's parental rights were terminated. The record does not support a finding that there was a substantial child-parent relationship in this case.

### III. NOTICE

Appellant further argues that he was not provided with proper notice of these proceedings, either at the

time of the initial petition or when the trial court heard the petition to terminate the parents' rights. Because I would conclude that appellant lacked standing to intervene, I would also conclude that this issue need not be addressed.

I would affirm.